Slip Op. No. 23-79

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | **Before: Timothy C. Stanceu, Judge**<br><br>**Consol. Court No. 17-00100** |

### OPINION

[Sustaining an agency decision issued in response to court order in litigation contesting results of an administrative review of an antidumping duty order on off-the-road tires from the People's Republic of China]

Dated:  May 18, 2023

*Richard P. Ferrin*, Faegre Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiff Xuzhou Xugong Tyres Co., Ltd.  With him on the briefs was *Douglas J. Heffner*.

*Richard P. Ferrin*, Faegre Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiff Trelleborg Wheel Systems (Xingtai) Co., Ltd.  With him on the briefs was *Douglas J. Heffner*.

*Ned H. Marshak*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, New York, argued for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the briefs were *Jordan C. Kahn*, *Elaine F. Wang*, and *Brandon M. Petelin*.

*Brandon M. Petelin*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Qihang Tyre Co., Ltd.  With him on the briefs were *Ned. H. Marshak*, *Elaine F. Wang*, and *Jordan C. Kahn*.

*Brandon M. Petelin*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Free Trade Zone Full-World International Trading Co., Ltd.  With him on the briefs were *Ned. H. Marshak*, *Elaine F. Wang*, and *Jordan C. Kahn*.

*Ned H. Marshak*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, New York, for plaintiff Aeolus Tyre Co., Ltd.  With him on the briefs were *Brandon M. Petelin*, *Elaine F. Wang*, and *Jordan C. Kahn*.

*Robert K. Williams* and *Lara A. Austrins*, Clark Hill PLC, of Chicago, Illinois, for plaintiff Weihai Zhongwei Rubber Co., Ltd.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Paul K. Keith*, Attorney, Office of the Chief Counsel For Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington D.C.

Stanceu, Judge:  The plaintiffs in this consolidated action contested an

administrative determination the International Trade Administration, U.S. Department

of Commerce ("Commerce" or the "Department"), issued to conclude a periodic review

of an antidumping duty order on off-the-road ("OTR") tires from the People's Republic

of China ("China" or the "PRC").[1]

---

[1] Consolidated under the lead case, *Guizhou Tyre Co. and Guizhou Tyre Import and Export Co. v. United States*, Court No. 17-00100, are *Aeolus Tyre Co. v. United States*, Court No. 17-00102; *Qingdao Free Trade Zone Full-World International Trading Co. v. United States*, Court No. 17-00103; *Xuzhou Xugong Tyres Co. v. United States*, Court No. 17-00104; *Trelleborg Wheel Systems (Xingtai) Co. v. United States*, Court No. 17-00111; *Qingdao Qihang Tyre Co. v. United States*, Court No. 17-00113; and *Weihai Zhongwei Rubber Co. v. United States*, Court No. 17-00123.  Order Granting Motion to Consolidate (June 16, 2017), ECF No. 24.

Before the court is the "Second Remand Redetermination," which Commerce submitted in response to a previous opinion and order in this litigation, *Guizhou Tyre Co. v. United States*, 45 CIT __, 519 F. Supp. 3d 1248 (2021) ("*Guizhou II*"). *Final Results of Redetermination Pursuant to Ct. Remand* (Sept. 24, 2021), ECF Nos. 109 (Conf.), 110 (Public), ("*Second Remand Redetermination*"). The court sustains the Second Remand Redetermination.

## I. BACKGROUND

### A. The Contested Determination

The determination contested in this litigation (the "Final Results") is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*"). *See also Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final Results*"). Commerce incorporated by reference in the Final Results and the Amended Final Results a final "Issues and Decision Memorandum" containing explanatory discussion. *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's*

*Republic of China; 2014-2015* (Int'l Trade Admin. Apr. 12, 2017) (P.R. Doc. 308) ("*Final*

*I&D Mem.*").[2]

### B.  The Seventh Review of the Antidumping Duty Order

Commerce issued an antidumping duty order (the "Order") on certain OTR tires

from China (the "subject merchandise") in 2008.  *Certain New Pneumatic Off-the-Road*

*Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination*

*of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l

Trade Admin. Sept. 4, 2008).  Commerce initiated the review at issue, the seventh

periodic administrative review of the Order, on November 9, 2015.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 69,193 (Int'l

Trade Admin.).  The seventh review pertained to entries of subject merchandise made

during the period of review ("POR") of September 1, 2014 through August 31, 2015.  *Id.*,

80 Fed. Reg. at 69,196.  Commerce published the preliminary results of the review on

October 14, 2016.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of*

*China: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed.

Reg. 71,068 (Int'l Trade Admin.).

For the review, Commerce selected two groups of respondents as "mandatory

respondents," i.e., respondents for which it intended to conduct individual

_____

[2] Documents in the Joint Appendix (July 30, 2018), ECF Nos. 62 (Conf.), 63 (Public), are cited as "P.R. Doc. __" for public documents.

examinations.  The first group of respondents consisted of Xuzhou Xugong Tyres Co.,

Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively,

"Xugong"), which Commerce treated as a single entity ("collapsed") for purposes of the

review.  The second group consisted of Guizhou Tyre Co., Ltd. and Guizhou Tyre

Import and Export Co., Ltd. (collectively, "GTC"), which Commerce also treated as a

single entity.  *Final Results*, 82 Fed. Reg. at 18,733–34 & nn.3–4.

Commerce concluded that Xugong established independence from the

government of China by rebutting the Department's presumption of *de jure* and *de facto*

government control and therefore, under its practice, qualified for a "separate rate," i.e.,

an antidumping duty rate other than the rate Commerce assigns to exporters and

producers it considers to be part of the "PRC-wide entity," i.e., those Chinese exporters

and producers of the subject merchandise that failed to rebut the Department's

presumption.  *Id.*, 82 Fed. Reg. at 18,734.[3]  In the Final Results, Commerce assigned a

---

[3] In addition to the mandatory respondent Xugong, Commerce determined that nine other Chinese companies or groups of companies qualified for a "separate rate": Qingdao Qihang Tyre Co., Ltd.; Qingdao Free Trade Zone Full-World International Trading Co., Ltd.; Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.; Shiyan Desizheng Industry & Trade Co., Ltd.; Qingdao Jinhaoyang International Co., Ltd.; Sailun Jinyu Group Co., Ltd.; Weifang Jintongda Tyre Co., Ltd.; Zhongce Rubber Group Co., Ltd.; and Weihai Zhongwei Rubber Co., Ltd.  These nine exporter/producers were not individually examined in the seventh review and therefore did not receive an individually determined rate.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733, 18,735 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*").

weighted-average dumping margin of 33.08% to Xugong and assigned to GTC the

PRC-wide rate, which in the seventh review was 105.31%.  *Id.*, 82 Fed. Reg. at 18,735.[4]

Commerce concluded that GTC, while demonstrating *de jure* independence from

government control, had not rebutted the presumption that the government of China

exercised *de facto* control over its export functions.  *Final I&D Mem.* at 8–9.

Because Xugong was the only individually-examined respondent that Commerce

determined to be qualified for a separate rate, Commerce assigned to all other separate

rate respondents a rate of 33.08%, equivalent to the margin it calculated for Xugong.

*Final Results*, 82 Fed. Reg. at 18,735.  In addition to GTC, Commerce determined that

Aeolus Tyre Co., Ltd. ("Aeolus") failed to qualify for a separate rate and therefore

treated it as part of the PRC-wide entity, assigning it the rate of 105.31%.  Commerce

made the same determination as to Tianjin Leviathan International Trade Co., Ltd.,

which is not a party to this case.  *Id.*

------------------------------

[4] The PRC-wide rate was carried over from the Department's determination in
the fifth administrative review.  *See Final Results*, 82 Fed. Reg. at 18,735 n.16.  This PRC-
wide rate was determined by calculating the average of the PRC-wide rate prior to the
fifth review (determined in the investigation) and the individually-determined rate
Commerce calculated for a respondent in the fifth review, Double Coin Holdings, Ltd.,
which is not a party to this case.  *See Certain New Pneumatic Off-the-Road Tires From the
People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-
2013* (Int'l Trade Admin. Apr. 15, 2015), 80 Fed. Reg. 20,197, 20,199.  The 105.31% rate is
based in part on the application of facts otherwise available and an adverse inference
and permissibly was carried over from prior reviews.  *See China Mfrs. Alliance, LLC v.
United States*, 1 F.4th 1028 (Fed. Cir. 2021).  In this case, no party challenges the basis for
the PRC-wide rate.

On June 14, 2017, Commerce issued the Amended Final Results to correct a

ministerial error.  *Amended Final Results*, 82 Fed. Reg. at 27,224.  Commerce determined

that the weighted-average dumping margin applicable to Xugong was 33.14% rather

than 33.08%.  *Id.*, 82 Fed. Reg. at 27,225.  Commerce applied this margin to the other

"separate rate" respondents.  *Id.*  The 105.31% rate applied to members of the PRC-wide

entity in the Final Results was unchanged.  *Id.*

### C.  The Parties to this Consolidated Case

The plaintiffs in this litigation include the two mandatory respondents, Xugong

(to which Commerce assigned a rate of 33.14%) and GTC (to which Commerce assigned

the 105.31% PRC-wide rate).  The other plaintiffs are Aeolus (to which Commerce also

assigned the PRC-wide rate) and four separate rate respondents, to each of which

Commerce assigned the 33.14% rate determined for Xugong in the Amended Final

Results: Qingdao Free Trade Zone Full-World International Trading Co., Ltd.; Qingdao

Qihang Tyre Co., Ltd.; Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.; and Weihai

Zhongwei Rubber Co., Ltd.  Defendant is the United States.

## II.  Discussion

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced

under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C.

§ 1516a, including an action contesting a final determination that Commerce issues to

conclude an administrative review of an antidumping duty order.[5]  In reviewing a final

determination, the court "shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence refers to

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B.  The Court's Prior Opinions

The court remanded the Final Results to Commerce in its first decision, *Guizhou*

*Tyre Co. Ltd. v. United States*, 43 CIT __, 389 F. Supp. 3d 1350 (2019) ("*Guizhou I*").

Commerce responded in a decision (the "First Remand Redetermination") submitted on

October 10, 2019.  *Final Results of Redetermination Pursuant to Ct. Remand*, ECF Nos. 74

(Conf.), 81 (Public) ("*First Remand Redetermination*").

In *Guizhou I*, the court held that Commerce unlawfully made deductions from

the starting prices used to determine the export price and constructed export price of

Xugong's subject merchandise to adjust for Chinese value-added tax ("VAT").

*Guizhou I*, 43 CIT at __, 389 F. Supp. 3d at 1364.  In the First Remand Redetermination,

---

[5] All citations to the United States Code herein are to the 2012 edition.

Commerce, under protest, redetermined Xugong's weighted average dumping margin

by removing the deductions for VAT, reducing Xugong's margin from 33.14% to

16.78%.  *Guizhou II*, 45 CIT at __, 519 F. Supp. 3d. at 1254.  Because Commerce used

Xugong's margin to determine the rate for the other separate rate respondents,

Commerce also lowered the rate for those respondents from 33.14% to 16.78%.  *Id.*

The court in *Guizhou I* also remanded for reconsideration the Department's

decisions in the Final Results that GTC and Aeolus failed to rebut the Department's

presumption of *de facto* government control.  Defendant requested a remand to allow

Commerce to reconsider its decision as to GTC.  *Id.*, 45 CIT at __, 519 F. Supp. 3d at 1252

(citing *Guizhou I*, 43 CIT at __, 389 F. Supp. 3d. at 1360).  As to Aeolus, the court's

opinion and order in *Guizhou I* concluded that Commerce had failed to consider all

record evidence and, in particular, had not addressed a "Rectification Report" that

Aeolus claimed demonstrated its independence from government control.  *Guizhou I*,

43 CIT at __, 389 F. Supp. 3d. at 1357–59 (citing *Letter from Grunfeld, Desiderio, Lebowitz,*

*Silverman & Kleistadt to U.S. Dep't. of Commerce* at Ex. 1A (Jan. 8, 2016) (C.R. Doc. 39)

(P.R. Doc. 79) ("*Rectification Report Letter*")).  In the First Remand Redetermination,

Commerce concluded, as it had in the Final Results, that both Guizhou and Aeolus had

failed to rebut the Department's presumption of government control.  *Guizhou II*, 45 CIT

at __, 519 F. Supp. 3d at 1253.  In each of those determinations, Commerce placed

considerable weight on a finding that a 100% government-owned entity was the largest

shareholder, albeit without majority ownership, and concluded that the government-owned shareholder had the ability to control the selection of members of the board of directors, which in turn selected senior management.  *Id.*, 45 CIT at __, 519 F. Supp. 3d. at 1256, 1259–60 (citing *First Remand Redetermination* at 7 (citing *Final I&D Mem.* at 10)).

The opinion and order in *Guizhou II* issued a second remand on the determinations by Commerce that GTC and Aeolus failed to rebut the presumption of government control.  The court noted a contradiction in the Department's description of the methodology by which it made those determinations.  Commerce identified four criteria for its inquiry as to *de facto* government control over export functions, as follows:

> Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto government* control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

*First Remand Redetermination* at 7 (citation omitted).  After recounting the four criteria Commerce identified, the court noted that the First Remand Redetermination stated that "Commerce's separate rate test examines all four *de facto* criteria."  *Guizhou II*, 45 CIT at __, 519 F. Supp. 3d at 1255 (quoting *First Remand Redetermination* at 41).  The court mentioned that the First Remand Redetermination "also states that 'in cases where a respondent was not majority owned by the government, Commerce has

examined the totality of the circumstances and made a reasonable inference that the

respondent does not control its export activities by examining the four *de facto* criteria,

as Commerce has done here.'"  *Id*., 45 CIT at __, 519 F. Supp. 3d at 1256 (quoting *First*

*Remand Redetermination* at 42).  The First Remand Redetermination also contained "the

contradicting statement that '[i]f a respondent is unable to rebut one of the four *de facto*

criteria, the company is ineligible for a separate rate.'"  *Id*., 45 CIT at __, 519 F. Supp. 3d

at 1255 (quoting *First Remand Redetermination* at 42 (citing *Zhejiang Quzhou Lianzhou*

*Refrigerants Co. v. United States*, 42 CIT __, __, 350 F. Supp. 3d 1308, 1313 (2018))).

        The Department's assertions that it examined all four of its criteria for *de facto*

control, when in fact it had not, required the court to remand the decisions to deny

separate rate status to GTC and Aeolus.  The court in *Guizhou II* found particularly

significant the Department's ignoring, and failing to state findings on, the first criterion,

which pertains to independence in setting export prices.  After discussing why a finding

of fact on that criterion is particularly relevant to the issue of whether an exporter or

producer should be included within the PRC-wide entity, the court concluded in

*Guizhou II* that Commerce had sidestepped that issue.  The court stated that "[b]ecause

Commerce, in the [First] Remand Redetermination, did not apply the first of its

factors—which inquires as to whether the export prices are set by or are subject to the

approval of a government authority—the court has no such finding of fact to subject to

judicial review under the substantial evidence standard." *Id.*, 45 CIT at __, 519

F. Supp. 3d at 1258.

While pointing out the several shortcomings of the Department's self-

contradictory methodology in the First Remand Redetermination, the court in

*Guizhou II* did not order Commerce to reverse its decision denying GTC and Aeolus

separate rate status.  Instead, the court ordered Commerce to "reach new decisions in

accordance with this Opinion and Order." *Id.*, 45 CIT at __, 519 F. Supp. 3d at 1261.

### C.  The Department's Revised Separate Rate Analyses in the Second Remand Redetermination

In the Second Remand Redetermination, Commerce made a finding on each

"prong" of its four-criteria test for *de facto* independence from government control, with

respect to both Aeolus and GTC.  Commerce found that both respondents satisfied the

first two prongs.  "Based on our review of the record, we conclude that it does not

contain affirmative evidence that the Chinese government 'actually did control' the

respondents' export pricing decisions (*i.e.*, the first prong)." *Second Remand*

*Redetermination* at 3.  Commerce further found:

> [T]here is no evidence to contradict statements and information in
> support of claims that Aeolus and GTC have authority to negotiate and
> sign contracts and other agreements (*i.e.*, the second prong) and, for
> Aeolus, no explicit evidence to contradict a finding that the respondent
> retains the proceeds of its export sales and makes independent decisions
> regarding disposition of profits or financing of losses (*i.e.*, the fourth
> prong).

*Id*. at 3–4.  Despite these findings, Commerce determined that Aeolus and GTC failed to rebut the presumption of government control of their respective export functions, asserting that a respondent must demonstrate independence from government control as described in each of the four prongs of its test.  Commerce found that "both companies failed to establish autonomy in the selection of management (*i.e.*, the third prong), and that GTC further failed to rebut the presumption of control with respect to independent decision-making regarding disposition of profits (*i.e.*, the fourth prong)." *Id.* at 4.  In making its findings under the third prong, Commerce began its analysis with the ownership structure of Aeolus and GTC, reiterating findings it had made previously.

Commerce found that a parent company of Aeolus, China Chemical Rubber Co., Ltd. (also known as China National Tire & Rubber Corp.), held a 42.58% share of Aeolus during the POR.  *Id*. at 5.  Commerce found, further, that this parent company was 100% owned by a state-owned enterprise, China National Chemical Corporation ("ChinaChem") and supervised by a State-owned Assets Supervision & Administration Commission ("SASAC"), a government entity.  *Id*.  Commerce also found that three other shareholders of Aeolus were state-owned enterprises supervised by SASACs, such that the "total SOE ownership in Aeolus" was 49.06%.  *Id*. (citation omitted).  From these and other findings, Commerce concluded that ChinaChem, a state-owned enterprise, was the "controlling shareholder" of Aeolus.  *Id*.

On GTC's ownership structure, Commerce found that Guiyang Industry
Investment (Group) Co., Ltd. ("GIIG"), owned 25.20% of Guizhou Tyre Co., Ltd. (of
which Guizhou Tyre Import and Export Co., Ltd. was a wholly-owned subsidiary) and
that GIIG was entirely owned by the Guiyang Municipal State-owned Assets
Supervision & Administration Commission ("Guiyang SASAC").  *Id*. at 7; *see Guizhou I*,
43 CIT at __, 389 F. Supp. 3d at 1359.  Commerce concluded that Guiyang SASAC "is
GTC's single largest and *de facto* controlling shareholder."  *Second Remand
Redetermination* at 7.

From the record evidence on ownership structure and other record evidence,
Commerce found that a government entity, as the controlling (although not majority)
shareholder in Aeolus and in GTC, controlled the selection of board members and that
the board controlled the selection of senior management.  Specifically, Commerce found
that Aeolus's Articles of Association ("AoA") "allows its majority shareholders to
control the selection of its board of directors, a board which, in turn, selects Aeolus's
general manager and deputy general manager."  *Second Remand Redetermination* at 6.  As
to GTC, Commerce found that "GIIG, through its 25.20 percent ownership stake,
controlled GTC's board nomination process" and that the board "is responsible for the
selection of senior management."  *Id*. at 9.

Aeolus and GTC oppose the Second Remand Redetermination.  Consol. Pl.'s
Comments on Second Remand Redetermination (Nov. 24, 2021), ECF Nos. 116 (Conf.),

117 (Public) ("Aeolus's Comments"); Pls.' Comments on Second Remand

Redetermination (Nov. 24, 2021), ECF Nos. 114 (Conf.), 115 (Public) ("GTC's

Comments").

The Department's revised analysis presents two issues.  First, the court must

decide whether requiring a respondent to satisfy all four prongs of the Department's

test to obtain separate rate status is a permissible methodology.  Second, if it is, then the

court must decide whether substantial evidence supported the Department's findings

that Aeolus and GTC failed to satisfy the third prong, which requires a demonstration

of independence in the selection of management.  The court addresses these two issues

below.

## 1.  The Department's Methodology for Effectuating its *De Facto* Test Is Not Impermissible *Per Se*

Both Aeolus and GTC object to the Second Remand Redetermination on the

ground that Commerce must base its decision on the total body of record evidence

pertaining to all four of its criteria ("prongs"), i.e., the totality of the circumstances.

Aeolus's Comments 14–18, 29–31; GTC's Comments 14–18, 28–31.  In the Second

Remand Redetermination, Commerce based its decision as to Aeolus on only the third

prong, "autonomy from the government in making decisions regarding the selection of

management," and based its decision as to GTC on the third and the fourth prong,

which requires independence in profit distribution decisions.  In effect, GTC and Aeolus

challenge the Department's methodology of requiring a separate rate respondent to

establish independence from government control as to each of the four criteria.

Aeolus's and GTC's challenges to the Department's application of its four-prong

test view the Department's conception of "export functions" as overly broad.

According to their arguments, independence in export pricing and in entering into

contracts (in the case of GTC) or independence in export pricing, in entering into

contracts, and in retaining proceeds of export sales and making independent decisions

regarding disposition of profits or financing of losses (in the case of Aeolus) should

suffice to rebut the presumption of government control of export functions.  In that

regard, the opinion and order in *Guizhou II* questioned the Department's application of

the four-prong test, noting the significance for the antidumping duty laws of

independence in setting prices for exported subject merchandise.  *See Guizhou II*, 45 CIT

at __, 519 F. Supp. 3d at 1257–60.

Aeolus and GTC argue that in *Guizhou II* the court *required* Commerce to base

any denial of separate rate status on evidence of government influence on price-setting.

Aeolus's Comments 14–18; GTC's Comments 14–18.  The court disagrees.  The opinion

and order in *Guizhou II* directed Commerce to reconsider its decisions as to Aeolus and

GTC but did not rule the Department's application of its four-prong test impermissible

*per se*.

The Second Remand Redetermination responded to the court's order by

providing an expanded discussion on the Department's reliance on the third criterion:

> Specifically, our finding that neither Aeolus nor GTC have
> autonomy in the selection of management allows for the reasonable
> inference, in light of the presumption of government control in NME
> [nonmarket economy] country proceedings, that their respective
> government shareholders maintain the potential to control the export
> operations of each company because the management of a firm controls
> its operations—including its export functions.

*Second Remand Redetermination* at 19.  Commerce also explained that it considers an

absence of evidence of direct government involvement in the setting of prices of the

exported subject merchandise insufficient to establish a company's independence in

"operations—including its export functions," *id.*, because doing so "ignores other

aspects of export activities where the government may exert control, such as influence

over export quantities/quotas, terms of sale, financing, customer relationships, contract

negotiation, transportation, customs requirements, management directives, selection of

export markets, export-related investment, *etc.*," *id.* at 23–24 (footnote omitted).

To place a company within the PRC-wide entity, Commerce considers it

sufficient that an entity of the Chinese government have effective control over the

selection of company management, which it views as signifying the power to influence

all of a company's business activities, including export functions.  *Final I&D Mem.* at 13.

The question presented is whether the court must reject the rationale Commerce stated

in the Second Remand Redetermination and thereby conclude that this agency practice

is impermissible *per se*.  Based on the explanation provided in the Second Remand

Redetermination, the court cannot reach that conclusion.  For the reasons discussed

below, the circumstances of this case do not place the court in a position to substitute its

judgment for the agency's on the question of just how much governmental "control"

over export functions sufficed to place an exporter or producer within the PRC-wide

entity.

Commerce has not grounded its regulatory scheme to effectuate its rebuttable

presumption of *de facto* government control in a specific provision of the Tariff Act or

implementing regulations.  *See Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*,

No. 23-14, 2023 WL 1867677, at *9 (Ct. Int'l Trade Feb. 9, 2023).  Because it exists apart

from the provisions in the Tariff Act and regulations, there is no statutory language,

legislative history, or regulatory language or preamble to guide the court in deciding

whether the Department's methodology is *ultra vires* or unreasonable *per se*.  In that

circumstance, the court cannot conclude that it necessarily was unreasonable for

Commerce to infer control of "export functions," broadly defined, from record facts

showing that a governmental agency had control over the selection of company

management and thus, indirectly, over business activity in general, which includes

activity related to the exportation of merchandise.  In addition, a court must recognize

an agency's discretion to draw reasonable inferences from record evidence.  *See SeAH*

*Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020) (quoting *Matsushita*

*Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) for the principle that

"substantial evidence includes 'reasonable inferences from the record'").

The court also is guided by binding precedent of the Court of Appeals for the

Federal Circuit ("Court of Appeals"), which repeatedly has affirmed the Department's

authority to apply a rebuttable presumption of government control in determining

which exporters and producers of a nonmarket economy ("NME") country, such as

China, to include within the NME-wide entity. *China Mfrs. Alliance, LLC v. United States*,

1 F.4th 1028, 1039 (Fed. Cir. 2021) ("*CMA*"); *Diamond Sawblades Mfrs. Coal. v. United*

*States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) ("*Diamond Sawblades*").  In light of the breadth

of the Department's discretion to craft its own antidumping duty procedures for

exports from NME countries, as the Court of Appeals recognized in its holdings in *CMA*

and *Diamond Sawblades*, the court is unable to agree with Aeolus and GTC that

Commerce lacked the discretion to implement its *de facto* test for government control

based principally on the third prong of that test.  According to the reasoning in those

cases, Commerce should be allowed broad discretion not only in applying its

presumption but also in setting forth the criteria by which it will effectuate it.  In other

words, the greater power to create an entire regulatory scheme for an NME-wide entity,

which the case law establishes, implies the lesser power to effectuate it through criteria

and procedures, such as those Commerce applied in this case, that define what the

agency means when it uses the term "government control" of export functions.

###### 2.   Commerce Permissibly Found that Aeolus Did Not Establish Independence from Government Control in the Selection of Company Management

Commerce identified record evidence that ChinaChem was, by far, the dominant shareholder casting votes for the election of members of Aeolus's board of directors. *Second Remand Redetermination* at 54 ("ChinaChem represented the vast majority of votes electing the board.") (citation omitted); *see also First Remand Redetermination* at 34–35 (showing the specific, proprietary percentages of votes by ChinaChem and comparing them to percentages for votes of other shareholders).  Commerce also considered that the votes cast by shareholders other than ChinaChem and other than the three other SOE shareholders were a very small percentage of the votes cast during the POR.  *First Remand Redetermination* at 34.  Commerce considered this significant because the board controlled the selection of Aeolus's general manager and deputy general manager.  *Id*. at 5; *Second Remand Redetermination* at 6.

Aeolus argues that Commerce erred in relying on the data on voting percentages because "[t]his Commerce calculation conflates the shareholder vote conducted on December 12, 2014, with the shareholder information provided as of December 31, 2014."  Aeolus's Comments 24 (citation omitted).  Aeolus posits that "Commerce concedes it does not know if the shareholder percentage changed in the 19 days between the vote and year-end, wrongly faulting Aeolus for Commerce's failure to have requested ownership data at the vote to support its denial."  *Id*. (citing *Second Remand*

*Redetermination* at 55).  According to Aeolus, Commerce impermissibly relied upon

speculation because "[w]ithout such data, Commerce improperly made assumptions

'about ChinaChem's presence at the vote.'"  *Id*. at 24–25 (citing *Second Remand*

*Redetermination* at 55).  This argument is unconvincing.  Commerce reasonably

interpreted the shareholder voting evidence on the record, which contained no evidence

that the ownership data changed during the 19-day period.  Aeolus did not submit

information for the record to show that it did or, if it did, that the change cast doubt on

the Department's findings that ChinaChem could exert control over the selection of

board members and that the non-government shareholders did not cast votes in any

meaningful percentage.

　　　Aeolus argues, further, that because its government ownership was only

minority ownership, denial of separate rate status required more indicia of government

control than the record indicated and that, accordingly, Aeolus rebutted the

presumption of government control.  According to Aeolus, Commerce failed to base its

separate rate denial on "on actual government control as opposed to mere potential to

control."  Aeolus's Comments 18–22.  In support of this argument, Aeolus cites several

decisions of this Court, *An Giang Fisheries Import & Export Joint Stock Co. v. United States*,

42 CIT __, __, 284 F. Supp. 3d 1350, 1359 (2018) ("*An Giang II*"), *An Giang Fisheries Import*

*& Export Joint Stock Co. v. United States*, 41 CIT __, __, 203 F. Supp. 3d 1256, 1291–92

(2017) ("*An Giang I*"), and *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT

__, __, 28 F. Supp. 3d 1317, 1348–50 (2014).  Aeolus's Comments 20–21.  The court rejects

this argument because the facts underlying these cases are not analogous to the record

facts here.

In the *An Giang* cases, the government-controlled entity that was the largest, but

still minority, shareholder did not have "the authority to appoint Directors without the

approval of 65% of the General Meeting of Shareholders."  *An Giang I*, 41 CIT at __, 203

F. Supp. 3d at 1290.  Ultimately, concluding that the respondent had "not demonstrated

how the protective rights available in the 2012 Articles of Association could have been

exerted during the first 61 days of the POR, when the 2006 Articles of Association

remained in effect," this Court held that the respondent failed to rebut the presumption

of government control, concluding that "[a]s a result, Commerce's determination that

there existed the potential for actual control by the minority government shareholder

during the POR was reasonable."  *An Giang II*, 42 CIT at __, 284 F. Supp. 3d at 1364.

*Jiangsu Jiasheng Photovoltaic Tech. Co.* is also inapposite, having turned on an issue

not presented by this case.  A domestic producer contested the Department's granting

separate rate status to respondents "whose senior managers and/or board directors held

membership or positions in certain state-owned enterprises or government entities."

*Jiangsu Jiasheng Photovoltaic Tech. Co.*, 38 CIT at __, 28 F. Supp. 3d at 1348.  Commerce

found that the respondents had satisfied all four prongs of the Department's *de facto*

test, reasoning that the "record does not show that the membership or position of senior

managers or board directors . . . resulted in a lack of autonomy on the part of the

respondent[s] to set prices, negotiate and sign agreements, *select management*, or decide

how to dispose of profits or financing of losses." *Id.*, 38 CIT at __, 28 F. Supp. 3d at 1349

(quoting the Department's *Issues & Decision Memorandum*) (emphasis added).  This

Court sustained the Department's determinations that the respondents established *de

facto* independence from government control.

Aeolus argues, also, that the AoA and various provisions of Chinese law ensured

"that the process was democratic" and subject to "myriad protections."  Aeolus's

Comments 25.  Aeolus surmises that "[r]ather than indicate impropriety, the board

election reveals that Aeolus is an ordinary publicly listed company operating

transparently through normal procedures, subject to legal restrictions."  *Id.*  Aeolus

adds that the AoA precludes ChinaChem's domination of the nomination of board

members by providing, for example, that all board members "must be re-elected to

retain their positions" and that non-independent directors may be nominated by

multiple shareholders.  *Id.* at 26.  These arguments also fail to persuade the court.  In

denying separate rate status to Aeolus, Commerce did not rely upon a finding that

Aeolus's governance procedures were other than transparent and democratic, or that

non-government shareholders were barred from participating in those procedures,

including procedures for nominating board members.  The Department's conclusions

instead reflected record data on shareholder voting, which supported a finding that a

government-owned shareholder had the ability to control board membership through

its predominance in the voting process, and the finding that the board controlled the

selection of senior management.  That a publicly-held company is governed by

transparent and democratic procedures, including procedures for electing board

members open to all shareholders, does not suffice to demonstrate autonomy from

government control of decisions on the selection of management where, as here, a

government entity was the dominant shareholder in the election of board members.

Aeolus argues that "[t]he Rectification Report does not prove government

control."  *Id*. at 27.  That may be true, but the salient point is that the information

concerning the Rectification Report that Aeolus placed on the record does not suffice to

establish that Aeolus was independent from government control in the selection of

management during the POR.  In the Second Remand Redetermination, Commerce

stated that it "interpreted the Rectification Report in context and concluded that the

corrective actions outlined in the Rectification Report did not prevent ChinaChem's

control of the board election process or establish Aeolus's independence from

government control."  *Second Remand Redetermination* at 56 (citing *First Remand*

*Redetermination* at 11).

As the court noted in *Guizhou I*, Aeolus placed on the record a translation of the

Rectification Report containing the statement, "'ChinaChem fully respects the

independence of a listed company and has never inquired about financial information

of the Company.'"  *Guizhou I*, 43 CIT at __, 389 F. Supp. 3d at 1358 n.9 (quoting

*Rectification Report Letter* at Ex. 1A).  The document further stated:

> Regarding the Company's investment, key projects, and tender
> process being reviewed and approved by ChinaChem.  ChinaChem and
> China National Tire & Rubber Corp. will strictly comply with the
> provisions of the *Company Law, Code of Corporate Governance for Listed
> Companies* and other relevant law and regulations, exert their investors'
> rights, fully respect the independence of a listed company, and let the
> Company's shareholders' meeting, board of directors and the
> management team perform their internal approvals on investments, key
> projects, and tender process based on their respective obligations,
> authority and rules of procedure.

*Id*.  Aeolus argued that "as of the publication of the Rectification Report (i.e., before the

POR), Aeolus's SOE shareholders could not access the company's financial information

and that review and approval of key projects did not depend on the company's SOE

shareholders but only on Aeolus's board of directors."  *Id*., 43 CIT at __, 389 F. Supp. 3d

at 1358 (citing *Rectification Report Letter* at Ex. 1A).

The Rectification Report, while constituting evidence that certain safeguards

were implemented prior to the POR to ensure Aeolus's independence from government

control in certain particular respects identified therein, is not evidence refuting a

finding that ChinaChem, through its wholly-owned subsidiary China Chemical Rubber

Co., Ltd., had the ability to control the election of directors during the POR, by which

time the Rectification Report, according to Aeolus, had been implemented.  While

containing the general assertion that ChinaChem and China National Tire & Rubber

Corp. will "fully respect the independence" of Aeolus, it is in the context of company governance by the "board of directors and the management team." *Rectification Report Letter* at 3–4, Ex. 1A.  The evidence Aeolus put on the record pertaining to the Rectification Report does not demonstrate that, after implementation, ChinaChem, through China National Tire & Rubber Corp., no longer was able to exert effective control over the election of directors or that the board, as constituted following board elections, was divested of the power to select senior management.

In summary, substantial evidence supported the findings by Commerce that ChinaChem, through its 100% ownership of China Chemical Rubber Co., Ltd., had the ability to control the selection of board members and that the board selected senior management of the company.  Commerce, therefore, permissibly determined that Aeolus had not demonstrated autonomy from the government in making decisions regarding the selection of management and, under the Department's methodology, failed to rebut a presumption of government control over its export activities.

### 3.  Commerce Permissibly Found that GTC Did Not Establish Independence from Government Control in the Selection of Company Management and in the Distribution of Profits

The Second Remand Redetermination, like the First Remand Redetermination, concluded that GTC failed to rebut the presumption of government control because it failed to establish independence from government control with respect to the third prong, i.e., autonomy from the government in making decisions regarding the selection

of management.  Among the Department's principal findings was a finding that "GIIG

effectively selected GTC's board," based on evidence of GIIG's percentage of the total

shares present at a meeting in December 2012 that elected the board, which remained in

place during the POR.  *Second Remand Redetermination* at 45–46 (stating the actual

percentage, for which proprietary treatment is claimed).

Commerce also found that the company's articles of association provided that

shareholders holding individually or jointly ten percent of the total shares have the

right to convene shareholder meetings and that no individual shareholder other than

GIIG met that requirement, the second-and third-largest shareholders having owned

9.97 and 7.74 percent of the total shares, respectively.  *Id*. at 49.

Commerce found, further, that the board selected the company's management

and also, with respect to the fourth prong of the Department's test, influenced the

company's decisions on the distribution of profits.  Commerce found that after GIIG's

preferred proposals on profit distribution and on the selection of managers failed at a

shareholder meeting in May 2015, GIIG called another meeting, held in July 2015, at

which GIIG's preferred proposals were adopted.  *Id*. at 43, 48–49.

In its comments on the Second Remand Redetermination, GTC argued that

Commerce overlooked the evidence that shareholders were not involved in the

nomination of board members and the evidence that the election of the board

"complied with all legal requirements proscribed by GTC's AoA, the PRC Law, and the

Code for Listed Companies—including protections against domination by any one

shareholder."  GTC's Comments 23–24.  GTC added that "[r]ather than indicate

impropriety, the 2012 Meeting reveals GTC acting as an ordinary publicly listed

company operating transparently and democratically through normal procedures,

subject to legal restrictions."  *Id.* at 24.  GTC argued that even assuming, *arguendo*, that

GIIG selected GTC's Board, the "Board and management operate the company

independently from shareholders including GIIG."  *Id.*  GTC pointed to various

provisions of its articles of association that limit the control that GIIG may exert,

including provisions limiting GIIG from nominating more than one-third of the board

and providing for cumulative voting.  *Id.* at 28.

GTC contests as unwarranted the Department's inference that a government-

owned shareholder may exert control over a company's business operations where, as

here, that shareholder controls the composition of the board of directors, as evidenced

by its percentage of the total shares present at the meeting that elected the board, and

where, as here, the board selects senior management.  But as discussed above, the court

must afford Commerce broad discretion to fashion the criteria by which it will

determine whether a respondent has rebutted the presumption of government control

over its business operations, including its export functions.  Commerce based its denial

of separate rate status on what it determined to be GTC's failure to demonstrate

independence in the selection of management and the distribution of profits.  It did so

based on findings, supported by record evidence, that GIIG had the ability to control the election of board members and influence the distribution of the company's profits. Commerce did not base its determination on the company's noncompliance with the articles of association or applicable Chinese law.

In summary, the court sustains the Department's decision to deny separate rate status to GTC, based on the findings and reasoning set forth in the Second Remand Redetermination.

### III.  CONCLUSION

Commerce applied a permissible methodology and reached findings supported by substantial evidence in determining that Aeolus and GTC did not qualify for separate rate status.  Therefore, the court will enter judgment sustaining the Second Remand Redetermination.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: May 18, 2023
         New York, New York